UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KADEEM JOHN,

               Plaintiff,

    -against-

CITY OF NEW YORK; NEW YORK CITY
DEPARTMENT OF CORRECTION ("DOC")
SUPERVISING WARDEN ARTHUR OLIVARI;
CHIEF OF DEPARTMENT LARRY W. DAVIS,
SR.; WARDEN EMMANUEL BAILEY;
DEPUTY WARDEN WALTER NIN;
CORRECTION OFFICER "DJ" DOE; and
CORRECTION OFFICER JOHN DOES #1-#5,

               Defendants.



11 Civ.

**11 CIV 5610**

COMPLAINT AND
**JURY DEMAND**

**ECF CASE**



Plaintiff Kadeem John ("Plaintiff"), by his attorneys Emery Celli Brinckerhoff &
Abady LLP and The Legal Aid Society, for his Complaint, alleges as follows:

## PRELIMINARY STATEMENT

    1.    Kadeem John is the teenage victim of a perverse and pervasive practice,
sanctioned at the highest levels of the New York City Department of Correction (the
"Department" or "DOC"), in which correction officers at a New York City jail engage inmates or
allow them to assault other inmates as a way to control and discipline those held in custody.
This practice, known commonly as "the Program," has been uncovered and substantiated by
investigations of the New York City Department of Investigation and the DOC's Inspector
General, leading to the indictments of a number of correction officers, and the conviction of at
least one correction officer, who worked in Robert N. Davoren Complex ("RNDC"), the
principal City jail for adolescent males.   In October 2008 an RNDC inmate died as a result of
this practice of Department-sanctioned inmate-on-inmate violence.   Yet nearly two years after

1

that tragedy, the "Program" continued, leading to a vicious attack on Mr. John when he was incarcerated at RNDC in 2010, which caused him a serious, continuing injury.

2.     The Bronx District Attorney ("DA") has explained that RNDC is run like an organized-crime family, where correction officers, under "The Program," give "favored prisoners free reign to beat, rob and extort whomever they please" — to quote an outraged Daily News editorial. RNDC was an "incubator for violent criminal activity sanctioned by adults in positions of authority," according to the DA. The motive for this brutality was to make correction officers' jobs easier by having the inmates maintain order among themselves.

3.     In a January 29, 2009 editorial, The New York Times described this as a "horror story." The Times demanded that "the entire culture" of RNDC "needs to be changed" and laid the blame squarely on the City for failing to properly train and supervise correction officers. Editorial, *Rikers Horror Story*, N.Y. Times, Jan. 29, 2009 at A26, available at http://www.nytimes.com/2009/01/29/opinion/29thu2.html.

4.     But despite the knowledge of high level DOC officials, correction staff continued "the Program." And as a direct result, in June 2010, Mr. John was beaten by other inmates who effectively ran the unit in RNDC in which he was housed— with the unjustified failure of corrections officers to intervene.   After he was severely beaten in a stairwell, Mr. John was moved into a dayroom, where he remained, in plain view of corrections officers, bleeding internally and slipping in and out of consciousness, for a significant period of time before an officer came to his aid, and finally brought him to the facility's clinic for medical attention.

5.     Mr. John sustained serious bodily injuries as a result of the beating, requiring two separate multiple-night hospital stays. He suffered injuries to his brain, kidney, and spleen. He continues to suffer short-term memory issues, blurry vision, and headaches.

## JURISDICTION AND VENUE

6.      This action arises under the Eighth and Fourteenth Amendments to the United States Constitution and under 42 U.S.C. §§ 1983 and 1988.

7.      The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343(a)(3)-(4) and 1367(a).

8.      The acts complained of occurred in the Southern District of New York and venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b).

## JURY DEMAND

9.      Mr. John demands trial by jury in the action.

## PARTIES

10.      Kadeem John is a citizen of the United States, and a resident of Brooklyn, New York.  At the time these events occurred, Mr. John was 18 years old.  At that time, he was in DOC custody at RNDC on Rikers Island in East Elmhurst, New York.

11.      Defendant City of New York ("City") is a municipal corporation which, through its Department of Correction, operates a number of detention facilities.  The Department, through its senior officials at the central office, in each facility, and in its specialized units, promulgates and implements policies, including those with respect to the use, reporting and investigation of force by both inmates and uniformed staff, and access to medical and other program services mandated by local law and court orders.  In addition, senior officials in the Department are aware of and tolerate certain practices by subordinate employees in the jails, including those that are inconsistent with formal policy.  These practices, because they are widespread, long-standing, and deeply embedded in the culture of the agency, constitute unwritten Department policies or customs.  The Department is also responsible for the

3

appointment, training, supervision, and conduct of all DOC personnel, including the defendants

referenced herein.

12.     At all times relevant hereto, Arthur Olivari was the Supervising Warden of

DOC with responsibility for RNDC, acting in the capacity of agent, servant, and employee of the

City, within the scope of his employment as such, and acting under color of state law.  On

information and belief, defendant Olivari, as Supervising Warden, was responsible for the

training, supervision, and conduct of all personnel in RNDC, including the defendants referenced

herein.  As Supervising Warden, defendant Olivari is also responsible for the care, custody, and

control of all inmates housed in RNDC.  As Supervising Warden, Olivari was provided on a

daily basis with reports of inmate-on-inmate violence, applications of force by staff, allegations

of unreported use of force, and other breaches of security in the Department jails.  In addition, at

all relevant times, defendant Olivari was responsible for enforcing the rules of the DOC, and for

ensuring that RNDC personnel obey the laws of the United States and of the State of New York.

Defendant Olivari is sued in his individual capacity.

13.     At all times relevant hereto, Larry W. Davis, Sr., was the Chief of

Department of DOC, acting in the capacity of agent, servant, and employee of the City of New

York, within the scope of his employment as such, and acting under color of state law.  As Chief

of Department, he was the highest ranking uniformed member of the department, and was

responsible for the supervision, oversight, and discipline of the uniformed security staff in all the

Department jails.  He was also responsible for the care, custody, and control of all inmates in the

Department jails.  As Chief of Department, Davis was provided on a daily basis with reports of

inmate-on-inmate violence, applications of force, allegations of unreported use of force, and

other breaches of security in Department jails.  Defendant Davis is sued in his individual capacity.

14.    At all times relevant hereto, defendant Emmanuel Bailey was the Warden of RNDC, acting in the capacity of agent, servant, and employee of defendant City, within the scope of his employment as such, and acting under color of state law.  On information and belief, defendant Bailey, as Warden of RNDC, was responsible for supervising correction officers, captains, and other supervisors with respect to the care, custody, and control of inmates confined at RNDC.  These responsibilities were required to be carried out in a manner consistent with the legal mandates that govern the operation of the DOC facilities, including Department policies, procedures, directives and protocols.  Defendant Bailey is sued in his individual capacity.

15.    At all times relevant hereto, defendant Walter Nin was the Deputy Warden for Security of RNDC, acting in the capacity of agent, servant, and employee of defendant City, within the scope of his employment as such, and acting under color of state law.  On information and belief, defendant Nin, as Deputy Warden for security of RNDC, was responsible for supervising correction officers, captains, and other supervisors with respect to the care, custody, and control of inmates confined at RNDC.  He was also responsible for investigating and correcting systemic security problems at RNDC.  These responsibilities were required to be carried out in a manner consistent with the legal mandates that govern the operation of the DOC facilities, including Department policies, procedures, directives and protocols.  Defendant Nin is sued in his individual capacity.

16.    Defendants Olivari, Davis, Bailey, and Nin are collectively referred to as the "Supervisory Defendants."

17.     At all times relevant hereto, defendant Correction Officer "DJ" Doe, whose full name and shield number plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so, was a correction officer within the DOC, acting in the capacity of agent, servant, and employee of defendant City, within the scope of his employment as such, and acting under color of state law. On information and belief, defendant "DJ" Doe worked at RNDC at the time of the incidents alleged herein, and was assigned to 2 Lower North, and failed to protect plaintiff from assault or intervene in the running of the Program at 2 Lower North. Defendant DJ Doe is sued in his individual capacity.

18.     At all times relevant hereto, Correction Officers John/Jane Does # 1-5 (along with Defendant DJ Doe, collectively referred to herein as the "Doe Defendants"), whose actual names and shield numbers plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so, but who are sued herein by the fictitious designation "John Doe" and "Jane Doe," were officers of DOC, acting in the capacity of agents, servants, and employees of defendant City, within the scope of their employment as such, and acting under color of state law. On information and belief, the Doe Defendants worked at RNDC at the time of incidents alleged herein and failed to protect plaintiff from assault or intervene in the running of the Program at 2 Lower North. The Doe Defendants are sued in their individual capacities.

## STATEMENT OF FACTS

## I.     RNDC: A History of Correction Officers Sanctioning Inmate Violence

19.     For years-- through Department reports, civil litigation, complaints from prisoners and advocacy organizations, news articles and criminal indictments and convictions-- the City and the Supervisory Defendants have been aware of the routine, dangerous and unconstitutional sanctioning of inmate-on-inmate violence at RNDC. In many well-documented

instances, DOC staff has instigated, encouraged or sanctioned the use of inmate enforcers to discipline other inmates.  That practice caused Mr. John's injuries.

20.    RNDC is a facility principally housing 16, 17 and 18 year old males, and, as such, officer-sanctioned violence against these youth is particularly pernicious.

21.    On February 26, 2008, the Bronx DA indicted RNDC correction officer Lloyd Nicholson for using inmates as enforcers and encouraging inmate-on-inmate violence. Officer Nicholson was subsequently convicted of gang assault and sentenced to six years in prison. *See* Bronx District Attorney, Press Release, Former New York City Correction Officer Sentenced to Six Years in Prison For Ordering Inmates on Riker Island to Beat Fellow Detainees at the City Jail, August 6, 2010, at http://bronxda.nyc.gov/information/ 2010/case29.htm.

22.    Nicholson's indictment and conviction were the result of investigations by the New York City Department of Investigations and the Inspector General for DOC which, according to the DA, "uncovered a systematic program allegedly run by Nicholson, in which he would use a select group of inmates to maintain order and enforce discipline.  The group of inmates would enforce rules of conduct established by Nicholson in exchange for preferential treatment, which included allowing them to extort commissary and telephone privileges as well as personal property from other inmates.  It is alleged that Nicholson benefited by not having to constantly monitor his post during his overnight tour of duty."  Bronx District Attorney, Press Release, New York City Correction Officer Charged with Gang Assault for Allegedly Ordering Inmates on Rikers Island to Beat Fellow Detainees at the City Jail, Feb. 26, 2008, available at http://bronxda.nyc.gov/information/2008/case9.htm.

23.    After a bench trial, a judge concluded that "the evidence proved beyond a reasonable doubt that Nicholson, 'acting in concert' with others, caused physical injury to two

inmates on June 10, 2007 by ordering six other inmates to beat them.  The beating was part of a

scheme called 'The Program' in which inmates were used to enforce discipline."  Bronx District

Attorney, Press Release, Former New York City Correction Officer Convicted of Gang Assault

for Ordering Inmates on Rikers Island to Beat Fellow Detainees at the City Jail, June 17, 2010,

available at http://bronxda.nyc.gov/information/2010/case21.htm

24.     On October 17, 2008, "the Program" proved fatal, when teenage inmate

Christopher Robinson died at RNDC after being beaten by other inmates.

25.     The Bronx DA alleged that Mr. Robinson was "brutally beaten because of

his refusal to go along with a violent extortion enterprise against adolescent inmates which was

jointly operated by the indicted correction officers and their teenage accomplices."

26.     The investigation into Mr. Robinson's death revealed that nine separate

officer-sanctioned beatings, of nine different adolescent inmates, had occurred since July 2008.

27.     In the wake of Mr. Robinson's death, on January 22, 2009, the Bronx DA

indicted three RNDC correction officers for conspiracy, enterprise corruption, and/or assault in

running "the Program" at RNDC.  The DA, in his press release, alleged that correction officers

"acted as managers for an organization referred to as 'the Program'" at RNDC.  Bronx District

Attorney, Press Release, The Death of an 18-Year-Old Inmate on Rikers Island Last October

Leads to Numerous Criminal Charges against Three Correction Officers and Twelve Teenage

Inmates, Jan. 22, 2009, available at http://bronxda.nyc.gov/information/2009/case3.htm.  As the

DA was later quoted as saying, "They didn't simply turn a blind eye to violence; they authorized

and directed it."  John Elgion, *Correction Officers Accused of Letting Inmates Run Rikers Island

Jail*, N.Y. Times, January 23, 2009.  The indictment reportedly said that "the two officers

instructed inmates to strike the victims only in the body, to avoid leaving any facial marks that

might attract attention.  Signals were used to alert inmate to abort assaults when other guards were in the area." *Id.*

28.     Under "the Program," correction officers "would cede responsibility for maintaining order to inmates known as 'the Team' whom they personally selected."  The Team would "maintain order" and, in exchange, the officers authorized the Team to extort property from other inmates.  "Inmates who refused to go along with the Program were punished by being assaulted" by the Team.  The officers would generally "designate the date, time, location and manner of the 'beatdown.'" *Id.*

29.     As part of "the Program," the officers would conceal evidence of these crimes by "failing to intervene or stop the inmate assaults, making false reports about the assaults or directing inmate victims to make false reports regarding the assaults or acts of extortion, and by using violence or the threat of violence to ensure the victims' continued participation in the Program." *Id.*

30.     On information and belief, the criminal case remains ongoing at the time of filing this Complaint.

31.     The City and Department were also aware that inmates were suffering injuries from "the Program" through civil litigation.  In March 2007, according to allegations in *Shuford v. City of New York*, 09-CV-0945, Tyreek Shuford, an inmate at RNDC, was beaten by other inmates who were assigned by corrections officers to be inmate enforcers at RNDC.  According to the allegations in that complaint, the beating arose out of Mr. Shuford's desire to sit in a chair in the dayroom.  Notwithstanding the presence of corrections officers, none intervened, or gave Mr. Shuford any medical attention, despite heavy bleeding, for two days.

32.     On April 16, 2007, according to allegations in another case in this Court (*Douglas v. City of New York,* 07-CV-8443, settled in 2009), Camillo Douglas and Luis Soriano, two RNDC inmates, were beaten by other inmates.

33.     According to the allegations in the *Douglas* Complaint, these beatings were sanctioned by the correction officers in that: (1) at first, all the cells were locked and a correction officer only opened Mr. Douglas's cell, enabling three inmate porters who were members of the Bloods gang to enter and attack Mr. Douglas with broomsticks and metal shanks; (2) while Mr. Douglas was being beaten, a correction officer unlocked all the inmates' cells, enabling additional members of the Bloods gang to beat Mr. Douglas and Mr. Soriano (who had attempted to aid Mr. Douglas); and (3) not a single correction officer attempted to intervene to protect either Mr. Douglas or Mr. Soriano.

34.     In fall of 2008, teenage inmate Alcides Polanco, as well as at least five other inmates, was severely beaten for not being a part of the "team" at RNDC.  This assault occurred merely five days after DOC officials were informed by the Legal Aid Society that another inmate had reported that he was beaten by fellow inmates after being asked if he was "with the Program."  The assault on Mr. Polanco was the subject of a case in this Court, *Polanco v. City of New York*, No. 09 Civ. 10131, filed in 2009 and settled and dismissed in 2010.

35.     For several years prior to the assault on Mr. John in 2010, the Legal Aid Society had relayed to the Department numerous complaints from RNDC inmates that they were beaten by other inmates for refusing to go along with "the Program," or that they feared for their safety because they did not wish to acquiesce to the gang members' demands.

36.     On November 24, 2008, The Legal Aid Society provided testimony, including over six full pages of written testimony, before the New York City Council about beatings pursuant to "the Program" at RNDC.

37.     The DOC Gang Intelligence Unit has compiled extensive data over a period of years documenting large numbers of adolescent inmates who have been assaulted by gang members in "Program"-related incidents.  This information confirmed the existence of the Program, and that gangs controlled inmates' daily lives at RNDC, even down to whether inmates could sit at a table.  Notwithstanding this investigation and other investigations that have taken place in the wake of the Robinson tragedy, the Program has sadly continued.

38.     RNDC is not the only facility at Rikers where guards sanction inmate-on-inmate violence.   According to press reports, Roger Cullen, a former correction officer at the Anna M. Kross Center ("AMKC"), a facility on Rikers Island, testified under oath about an inmate-on-inmate assault at AMKC in 2003.  Cullen testified that the inmate assailant had essentially been deputized as an enforcer by correction officers to control the other inmates.

39.     Through DOC's elaborate reporting system, the City and the Supervisory Defendants were aware of the pattern of a large number of incidents involving inmate-on-inmate violence and have failed to take sufficient steps to curb these beatings.

40.     The City and the Supervisory Defendants were also aware, or should have been aware, which staff members were involved in incidents in which inmates were injured by other inmates.  Yet , notwithstanding that information, they have failed to take sufficient steps to curb these beatings.

41.     The City and the Supervisory Defendants were also aware, or should have been aware, of the failure of the Department to bring disciplinary charges against those officers

who sanction or ignore inmate-on-inmate violence, punish staff that sanction such violence, and discourage others from doing so.

42.     Through all these cases, Department reports, and other complaints, the City and the Supervisory Defendants have been made aware of the widespread practice by DOC staff of sanctioning or encouraging violence against inmates, at RNDC in particular. They have also been made aware of the failures of DOC's Investigation Division to adequately investigate allegations of correction officers' complicity in such beatings, a practice that causes further abuse.

43.     Finally, "the Program" has been widely documented and covered in New York media, in numerous articles and television pieces between 2008 and the assault of Mr. John in June 2010. *See, e.g.*, Sarah Wallace, *Behind the Walls of Rikers Island*, ABC 7 Eyewitness News, April 1, 2009, available at http://abclocal.go.com/wabc/story?section=news/ investigators&id=6738749; Graham Rayman, *Rikers Fight Club*, The Village Voice, Feb. 4, 2009, available at http://www.villagevoice.com/2009-02-04/news/rikers-fight-club; Benjamin Weiser, *Lawsuits Suggest Pattern of Rikers Guards Looking Other Way*, N.Y. Times, Feb. 3, 2009, available at http://www.nytimes.com/2009/02/04/nyregion/04rikers.html; John Eligon, *Correction Officers Accused of Letting Inmates Run Rikers Island Jail*, N.Y. Times, Jan. 22, 2009, available at http://www.nytimes.com/2009/01/23/nyregion/23bronx.html; Graham Rayman, *Teen Murder at Rikers Jail*, The Village Voice, Nov. 19, 2008, available at http://www.villagevoice.com/content/printVersion/745359.

## II.     The Events of June 2010

44.     Plaintiff Kadeem John, then aged 18, was incarcerated and committed to the custody of the Department on June 10, 2010, for a probation violation and turnstile jump. On

or around June 14, 2010, Mr. John was moved to the Robert N. Davoren Center ("RNDC"), 2

Lower North ("2LN"), a facility for adolescent males.

      45.     While in 2LN, Mr. John was subjected to the gang domination and

intimidation characteristic of "the Program" at RNDC.

      46.     Shortly after his arrival, Mr. John learned that an inmate enforcer named

"Banks," believed to be a member of "the Bloods" gang, controlled the service of meals, access

to telephones, and seating arrangements in the 2LN dayroom. Banks, who had a "Team" of

approximately ten members, openly displayed his power in a manner apparent to inmates and

DOC staff. To become a member of the "Team," one was required to put in "work" – usually,

assault new arrivals to 2LN, and also to clean up around 2LN.

      47.     Banks and the Team also often required inmates to give them a share of

the inmates' commissary allowances. Often, inmates, including Mr. John, would find their

commissary items had been removed from their locked cells, and the prevailing wisdom was that

Banks or his Team had seized them with the cooperation and facilitation of uniformed staff.

      48.     Banks's domination was blatant and apparent to the staff, including

Defendant Officer DJ Doe and Officer John/Jane Does #1-#5, who were steady officers and

observed the gang's demands. Banks sat on top of the Team table, and openly displayed his

authority. He often received gifts and extra commissary items passed under his cell door. Banks

also controlled the distribution of cigarettes within 2LN. The Supervisory Defendants and Doe

Defendants were aware of this behavior.

      49.     Although correction officers would inform inmates when they could use

the telephones in 2LN, Banks had an effective veto over their decisions, and would often tell

inmates they could not use the phone.   The Supervisory Defendants and Doe Defendants were aware of this behavior.

50.     In the 2LN dayroom, there were three tables, one for Bloods to sit at, one for "the Team," and one referred to as "the dick table," for inmates who were not allowed to sit at either of the other tables.

51.     When Mr. John first arrived in 2LN, he did not sit at a table in the dayroom at all; he stood while eating or watching television.  After approximately four days, though, tired of standing, he sat down at the Team table.  Shortly after, Banks told him he was not allowed to sit there.  Banks ordered Mr. John to perform clean up chores or to share his commissary.  After Mr. John refused to do so, Banks glared at Mr. John, physically blocked his path with his body, and bumped his shoulder, a gesture Mr. John understood to be threatening. This incident was in open view of the correction officers in the dayroom and in the "bubble."

52.     A few days after this incident, out of fear, Mr. John began to sit at the dick table.

53.     About a week after Mr. John arrived at 2LN, two new inmates were admitted to 2LN.  Mr. John saw Banks take them to the corner and talk with them.  Mr. John was later told that the new inmates were told they "would have to put in some work," meaning fight another inmate, to sit at the Blood or the Team table.  These new inmates were permitted to sit at the Blood table and were not required to give Banks a portion of their commissary allowance.

54.     Shortly thereafter, Mr. John saw two inmates beaten by gang members, including the two newly admitted inmates, in the dayroom.  A correction officer intervened in an attempt to stop the beatings, but failed to succeed in doing so.  One of the assaulted inmates was brought back to the housing area, where Mr. John heard the inmate's assailants taunting him all

night, saying, "When we lock you out, it's over for you." The assailants were never moved out of the house. The Supervisory Defendants were, or should have been, aware of this incident.

55.    After this fight occurred, a response squad came to the housing area. An Department Captain, whose name is not known, ordered each of the 2LN inmates to line up, on their knees, with their hands behind their heads. The Captain then proceeded to kick each of the inmates, including Mr. John, serially.

56.    A few days later, a new inmate (name unknown) who was known to other inmates to be a member of the Bloods transferred to the house. In front of the correction officers, other members of the Bloods asked him, "What's poppin?" (a known Blood greeting), and "What you going to be doing when you get in here?" (a reference to the "work" he would be "putting in"). The corrections officers assigned to 2LN overheard this, yet failed to do anything.

57.    Shortly thereafter, Mr. John was told by another inmate that Banks had told this new inmate to "kick Kadeem out of the crib" and that Mr. John was about to "get killed," meaning beaten.

58.    The new inmate started to give Mr. John threatening looks, and would frequently intentionally bump him in the dayroom and dining area, which Mr. John understood to be a subtle threat. The inmate also made it a point to be directly behind Mr. John whenever the inmates lined up to move around the facility. This was in full view of the Doe defendants.

59.    On Saturday, June 26, Mr. John was in a group of inmates from 2LN and 2 Lower South who went to the gym. While in the gym, Mr. John felt he was being watched by other inmates.

60.    After the group lined up to return to 2LN, the newly arrived inmate asked the inmate behind Mr. John to switch places with him. This inmate then stepped on the back of

Mr. John's sneaker in order to provoke a fight.  The group walked down the main corridor, then turned into a stairwell leading to 2LN.  At that moment, in the presence of the escorting officers, Mr. John was hit in his temple from behind, then struck in the face and lower back. Approximately four other inmates besides his initial assailant then joined in the beating, while another inmate was being beaten concurrently in the same stairwell.   No correction officer intervened to protect Mr. John.  Mr. John eventually fell to the floor of the landing and lost consciousness.

61.    Inmates at RNDC are not allowed to walk from the gym to their unit without escorting officers.  The escorting officers, Defendant Does, failed to intervene or adequately protect Mr. John from this beating.  This beating would not have been possible without the explicit or implicit sanctioning of Department officers, who turned a blind eye to the assault.  The Defendant Does also failed to immediately seek medical assistance for Mr. John, in a show of deliberate indifference to the safety and security of inmates.

62.    Mr. John woke up in the dayroom of the housing area, lying on a table, feeling intense discomfort in his abdomen.  After a significant period of time passed, where one or more correction officers told Mr. John to "stop sleeping," another correction officer eventually emerged from the observation bubble and obtained medical assistance.  Mr. John was escorted to the clinic, where he was put on a gurney and taken to Elmhurst Hospital by emergency medical services.  Mr. John was slipping in and out of consciousness while at Rikers.

63.    Upon arriving at the hospital, Mr. John was diagnosed with a number of serious injuries, including a subarachnoid hemorrhage, splenic hematoma, and left kidney laceration.  A later examination indicated a left frontal/mandibular bruise.  In addition to

abdominal and severe head pain, Mr. John had grossly bloody urine.  Four days later, he was

discharged to Rikers Island and given a prescription for anti-epileptic medication.

64.    Upon returning to Rikers, Mr. John experienced worsening headaches,

dizziness, blurry vision, and continued renal bleeding.  He was referred to Bellevue Hospital on

July 7 for follow-up treatment, where a CT scan revealed, *inter alia*, a renal laceration measuring

1.4 cm.

65.    Mr. John continues to suffer lingering effects from the beating he suffered.

He periodically experiences headaches and violent stomach pain.  He has blurry vision in his

right eye, and experiences difficulties with short-term memory.

## FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983/ Eighth and Fourteenth Amendments
### (against Supervisory Defendants
### and the Doe Defendants)

66.    Plaintiff repeats and realleges the foregoing paragraphs as if the same

were fully set forth at length herein.

67.    On or about June 26, 2010, Mr. John was beaten by several inmate

assailants and the Doe Defendants failed to intervene or otherwise protect Mr. John as they were

obligated to do, as alleged above.

68.    By reason of the foregoing, and by sanctioning, encouraging, and failing

to prevent inmate assailants from assaulting, battering, and using gratuitous, excessive, brutal,

sadistic, and unconscionable force, the Supervisory and Doe Defendants deprived plaintiff of

rights, remedies, privileges, and immunities guaranteed to every citizen of the United States,

secured by 42 U.S.C. § 1983, including, but not limited to, rights guaranteed by the Eighth and

Fourteenth Amendments to the United States Constitution to be free from cruel and unusual

punishment and gratuitous and excessive force.

69.     The Supervisory and Doe Defendants acted under pretense and color of state law and in their individual and official capacities and within the scope of their employments as DOC officers and employees.  Said acts by defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers.  These defendants acted willfully, knowingly, and with the specific intent to deprive plaintiff of his constitutional rights secured by 42 U.S.C. § 1983, and the Eighth and Fourteenth Amendments to the United States Constitution.

70.     The Supervisory Defendants knew that the pattern of sanctioned inmate-on-inmate assaults described above existed in the City jails, including RNDC, prior to and including the time of the assault on plaintiff.  Their failure to take measures to curb this pattern of misconduct constitutes acquiescence in the known unlawful behavior of subordinate staff. The prevalence of these practices and general knowledge of their existence at the time of plaintiff's beating, and the failure of defendants to take remedial action despite the fact that the use of inmate enforcers had been persistently brought to their attention, constitutes deliberate indifference to the rights and safety of the inmates in their care and custody, including the inmate named as a plaintiff in this action.  These defendants' conduct has been a substantial factor in the continuation of such violence and a proximate cause of the constitutional violations alleged in this complaint.

71.     As a direct and proximate result of the misconduct, abuse of authority detailed above, plaintiff sustained the damages hereinbefore alleged.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983/Eighth and Fourteenth Amendments**
**(against City of New York)**

72.     Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

73.     Defendant City, through DOC, and acting under the pretense and color of law, has permitted, tolerated and been deliberately indifferent to a pattern and practice of inmate-on-inmate assaults sanctioned by uniformed staff and their superiors.  The City has been on notice of the existence of the Program and the injuries it has inflicted on inmates such as Mr. John for several years, and failed to adequately protect inmates from such violence.  The widespread tolerance of correction officers' sanction of inmate assaults, and the existence of the Program generally, constitutes a municipal policy, practice or custom and led to plaintiff's assault.

74.     By permitting, tolerating and sanctioning a persistent and widespread policy, practice and custom pursuant to which plaintiff was subjected to a brutal beating by inmate assailants on June 26, 2010, defendant City has deprived plaintiff of rights, remedies, privileges, and immunities guaranteed to every citizen of the United States, secured by 42 U.S.C. § 1983, including, but not limited to, rights guaranteed by the Fourteenth Amendment to the United States Constitution to be free from gratuitous and excessive force.

75.     As a direct and proximate result of the misconduct, abuse of authority and the policy, practice and custom detailed above, plaintiff sustained the damages hereinbefore alleged.

## THIRD CLAIM FOR RELIEF
### Negligence
### (Against all Defendants)

76.    Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

77.    Defendant City, through the DOC, the Supervisory Defendants, and the Doe Defendants, owed a duty of care to plaintiff to prevent the conduct alleged, because under the same or similar circumstances a reasonable, prudent and careful person should have anticipated that injury to plaintiff or to those in a like situation would probably result from the foregoing conduct.

78.    Despite their knowledge of the existence of the Program and the injuries it has inflicted on dozens of adolescent inmates at RNDC, the City, the Supervisory Defendants, and the Doe Defendants, failed to take adequate steps to address the Program's existence and protect the inmates at RNDC.  This failure constituted a breach of their duty, and proximately caused the assault of Plaintiff in June 2010.

79.    Additionally, despite their duty to protect Mr. John while escorting him from the gym to 2LN in June 2010, the Doe Defendants failed to take reasonable steps to do so. This failure constituted a breach of their duty, and proximately caused the assault on Plaintiff in June 2010.

80.    As a direct and proximate result of the negligence detailed above, plaintiff sustained the damages hereinbefore alleged.

**PRAYERS FOR RELIEF**

WHEREFORE, plaintiff requests that the Court grant the following relief jointly and severally

against defendants:

        1.     Compensatory damages in an amount to be determined at trial for the

physical and psychological injuries sustained by Mr. John as a result of the events alleged herein.

        2.     Punitive damages in an amount to be determined at trial.

        3.     An order awarding plaintiff reasonable attorneys' fees, together with the

costs of this action.

        4.     Such other further relief as the Court may deem appropriate.

Dated: August 11, 2011
New York, New York

                                                    EMERY CELLI BRINCKERHOFF
                                                    & ABADY LLP

                                                    Jonathan S. Abady
                                                    Adam R. Pulver
                                                    75 Rockefeller Plaza, 20th Floor
                                                  New York, New York 10019
                                                  (212) 763-5000

                                                  THE LEGAL AID SOCIETY
                                                  Jonathan S. Chasan
                                                  Mary Lynne Werlwas
                                                  199 Water Street, 6th Floor
                                                  New York, New York 10038
                                                  (212) 577-3530

                                                  *Attorneys for Plaintiff*